1   BARBARA J. PARKER (Bar No. 69722)
    bparker@oaklandcityattorney.org
2   OTIS McGEE JR. (Bar No. 71885)
    omcgeejr@oaklandcityattorney.org
3   MARIA BEE (Bar No. 167716)
    mbee@oaklandcityattorney.org
4   ERIN BERNSTEIN (Bar No. 231539)
    ebernstein@oaklandcityattorney.org
5   **OAKLAND CITY ATTORNEY**
    One Frank Ogawa Plaza, 6th Floor
6   Oakland, California 94612      JAMES W. QUINN
    Telephone: (510) 238-3601       jquinn@bafirm.com
7   Facsimile: (510) 238-6500       DAVID BERG
                                 dberg@bafirm.com
8   CLIFFORD H. PEARSON (Bar No. 108523)   MICHAEL M. FAY
    cpearson@pswlaw.com           mfay@bafirm.com
9   DANIEL L. WARSHAW (Bar No. 185365)   JENNY H. KIM
    dwarshaw@pswlaw.com          jkim@bafirm.com
10   MICHAEL H. PEARSON (Bar No. 277857)   CHRISTOPHER L. SPRENGLE
     mpearson@pswlaw.com         csprengle@bafirm.com
11   MATTHEW A. PEARSON (Bar No. 291484)   BRONWYN M. JAMES
     mapearson@pswlaw.com         bjames@bafirm.com
12   **PEARSON, SIMON & WARSHAW, LLP**   **BERG & ANDROPHY**
     15165 Ventura Boulevard, Suite 400     120 West 45th Street, 38th Floor
13   Sherman Oaks, California 91403      New York, New York 10036
     Telephone: (818) 788-8300        Telephone: (646) 766-0073
14   Facsimile: (818) 788-8104         Facsimile: (646) 219-1977

15   [Additional Counsel Listed on Signature Page]

16   *Attorneys for Plaintiff City of Oakland*

17            **UNITED STATES DISTRICT COURT**

18      **NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

19

20   CITY OF OAKLAND,            CASE NO.

21        Plaintiff,            **COMPLAINT FOR DAMAGES**

22        v.                 **JURY TRIAL DEMANDED**

23   THE OAKLAND RAIDERS, A
    CALIFORNIA LIMITED PARTNERSHIP;
24   ARIZONA CARDINALS FOOTBALL CLUB
    LLC; ATLANTA FALCONS FOOTBALL
25   CLUB, LLC; BALTIMORE RAVENS
    LIMITED PARTNERSHIP; BUFFALO
26   BILLS, LLC; PANTHERS FOOTBALL,
    LLC; THE CHICAGO BEARS FOOTBALL
27   CLUB, INC.; CINCINNATI BENGALS,
    INC.; CLEVELAND BROWNS FOOTBALL
28   COMPANY LLC; DALLAS COWBOYS

FOOTBALL CLUB, LTD.; PDB SPORTS, LTD.; THE DETROIT LIONS, INC.; GREEN BAY PACKERS, INC.; HOUSTON NFL HOLDINGS, LP; INDIANAPOLIS COLTS, INC.; JACKSONVILLE JAGUARS, LLC; KANSAS CITY CHIEFS FOOTBALL CLUB, INC.; CHARGERS FOOTBALL COMPANY, LLC; THE RAMS FOOTBALL COMPANY, LLC; MIAMI DOLPHINS, LTD.; MINNESOTA VIKINGS FOOTBALL, LLC; NEW ENGLAND PATRIOTS LLC; NEW ORLEANS LOUISIANA SAINTS, LLC; NEW YORK FOOTBALL GIANTS, INC.; NEW YORK JETS LLC; PHILADELPHIA EAGLES, LLC; PITTSBURGH STEELERS LLC; FORTY NINERS FOOTBALL COMPANY LLC; FOOTBALL NORTHWEST LLC; BUCCANEERS TEAM LLC; TENNESSEE FOOTBALL, INC; PRO-FOOTBALL, INC.; and THE NATIONAL FOOTBALL LEAGUE,

Defendants.

1

COMPLAINT FOR DAMAGES

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................. 2

II.   PARTIES ........................................................................................... 8

III.  JURISDICTION AND VENUE ............................................................. 11

IV.   INTRADISTRICT ASSIGNMENT ........................................................ 11

V.    FACTUAL ALLEGATIONS ................................................................. 11

    A.   Background ............................................................................ 11

        1.   The NFL's Complete Market Power Over NFL Franchise Locations ........ 11

        2.   The NFL's Relocation Process ...................................... 14

            (a)   The Relocation Policies .............................. 14

            (b)   The Relocation Fee ..................................... 16

        3.   The Raider's History In Oakland .................................. 17

            (a)   The Raiders' Identity Is Inextricably Linked With Its Oakland Fans ............................................. 17

            (b)   The Hectic Al Davis Years ............................ 17

    B.   The Raiders' Unlawful Relocation From Oakland ....................... 20

        1.   The Raiders And NFL Decide To Leave Oakland ......... 20

        2.   The Raiders' Pretextual And Bad Faith Negotiations With Oakland ........ 21

        3.   Defendants' Collusive Relocation Fee Determination And Relocation Vote ........ 24

    C.   The Unlawful Conspiracy Behind The Raiders' Relocation ....................... 28

    D.   The Relevant Market Applicable To Defendants' Misconduct ....................... 30

    E.   Defendants' Conduct Has Injured Competition ....................... 31

    F.   Defendants' Anticompetitive Conduct Has Injured Plaintiff ....................... 32

VI.   CAUSES OF ACTION ........................................................................ 32

    COUNT I:   Violation of the Sherman Act (15 U.S.C. § 1) Group Boycott: Damages/Disgorgement ........ 32

    COUNT II:   Violation of the Sherman Act (15 U.S.C. § 1) Refusal to Deal: Damages/Disgorgement ........ 34

COUNT III: Violation of the Sherman Act (15 U.S.C. § 1) Price Fixing: Damages/Disgorgement ........................................................................... 36

COUNT IV: Violation of the Sherman Act (15 U.S.C. § 1) Declaratory Judgment.......... 37

COUNT V: Breach of Contract (Cal. Civ. Code § 1559) Damages ................................ 39

COUNT VI: Quantum Meruit Restitution ..................................................................... 41

COUNT VII: Unjust Enrichment Under California Law Damages/Disgorgement .......... 43

VII.    PRAYER FOR RELIEF........................................................................................... 44

VIII.   DEMAND FOR JURY TRIAL................................................................................ 45

Plaintiff City of Oakland ("Oakland" or "Plaintiff"), by and through its attorneys, the Offices of the Oakland City Attorney; Berg & Androphy; and Pearson, Simon & Warshaw, LLP, as and for its complaint against Defendants The Oakland Raiders, a California Limited Partnership, d/b/a Oakland Raiders ("Raiders"); Arizona Cardinals Football Club LLC, d/b/a Arizona Cardinals ("Cardinals"); Atlanta Falcons Football Club, LLC, d/b/a Atlanta Falcons ("Falcons"); Baltimore Ravens Limited Partnership, d/b/a Baltimore Ravens ("Ravens"); Buffalo Bills, LLC, d/b/a Buffalo Bills ("Bills"); Panthers Football, LLC, d/b/a Carolina Panthers ("Panthers"); The Chicago Bears Football Club, Inc., d/b/a Chicago Bears ("Bears"); Cincinnati Bengals, Inc., d/b/a Cincinnati Bengals ("Bengals"); Cleveland Browns Football Company LLC, d/b/a Cleveland Browns ("Browns"); Dallas Cowboys Football Club, Ltd., d/b/a Dallas Cowboys ("Cowboys"); PDB Sports, Ltd., d/b/a Denver Broncos ("Broncos"); The Detroit Lions, Inc., d/b/a Detroit Lions ("Lions"); Green Bay Packers, Inc., d/b/a Green Bay Packers ("Packers"); Houston NFL Holdings, LP, d/b/a Houston Texans ("Texans"); Indianapolis Colts, Inc., d/b/a Indianapolis Colts ("Colts"); Jacksonville Jaguars, LLC, d/b/a Jacksonville Jaguars ("Jaguars"); Kansas City Chiefs Football Club, Inc., d/b/a Kansas City Chiefs ("Chiefs"); Chargers Football Company, LLC, d/b/a Los Angeles Chargers ("Chargers"); The Rams Football Company, LLC, d/b/a Los Angeles Rams ("Rams"); Miami Dolphins, Ltd., d/b/a Miami Dolphins ("Dolphins"); Minnesota Vikings Football, LLC, d/b/a Minnesota Vikings ("Vikings"); New England Patriots LLC, d/b/a New England Patriots ("Patriots"); New Orleans Louisiana Saints, LLC, d/b/a New Orleans Saints ("Saints"); New York Football Giants, Inc., d/b/a New York Giants ("Giants"); New York Jets, LLC, d/b/a New York Jets ("Jets"); Philadelphia Eagles, LLC, d/b/a Philadelphia Eagles ("Eagles"); Pittsburgh Steelers, LLC, d/b/a Pittsburgh Steelers ("Steelers"); Forty Niners Football Company LLC, d/b/a San Francisco 49ers ("49ers"); Football Northwest LLC, d/b/a Seattle Seahawks ("Seahawks"); Buccaneers Team LLC, d/b/a Tampa Bay Buccaneers ("Buccaneers"); Tennessee Football, Inc., d/b/a Tennessee Titans ("Titans"); and Pro-Football, Inc., d/b/a Washington Redskins ("Redskins," and with the Raiders, Cardinals, Falcons, Ravens, Bills, Panthers, Bears, Bengals, Browns, Cowboys, Broncos, Lions, Packers, Texans, Colts, Jaguars, Chiefs, Chargers, Rams, Dolphins, Vikings, Patriots, Saints, Giants, Jets, Eagles, Steelers, 49ers,

1

Seahawks, Buccaneers and Titans, the "NFL Clubs"); and The National Football League ("NFL," and with the NFL Clubs, the "Defendants"), allege as follows:

## I.    PRELIMINARY STATEMENT

1.    This is an action for damages and other relief arising out of the Defendants' unlawful decision to boycott Oakland, as the host city of the Raiders, and relocate the Raiders to Las Vegas, Nevada.

2.    In 2017, the Raiders announced that they were leaving Oakland for Las Vegas. Although Oakland went to extraordinary efforts to keep the Raiders from leaving, the ultimate calculation was purely monetary:  Las Vegas offered $750 million, ostensibly for a new stadium, and the Raiders are paying $378 million to the NFL Clubs for voting "yes" on the Las Vegas relocation.  This $378 million "relocation fee" served no legitimate purpose and, instead, skewed the bidding process for the Raiders in favor of relocation by enriching the NFL Clubs for their positive votes for the Raiders' move.  While Oakland proposed a $1.3 billion new stadium that included a mix of public and private funding to the tune of $750 million, Oakland's offer did not, and could not, put tens of millions of additional dollars in additional supra-competitive cartel payments in the form of a relocation fee directly into the pockets of each of the remaining 31 NFL Club owners.  Only relocating the Raiders did.

3.    The Raiders' move – and the bidding process which preceded it – violated not only the antitrust laws, but also the NFL's own relocation policies.  More than 35 years ago, the United States Court of Appeals for the Ninth Circuit affirmed that Article 4.3 of the NFL Constitution and Bylaws ("NFL Constitution," attached hereto in its entirety as Exhibit "1") – which requires three-fourths approval of all NFL Clubs for team relocations – amounted to an unreasonable restraint of trade in violation of Section 1 of the Sherman Act because no objective standards or durational limits were incorporated into the voting requirements.  *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381 (9th Cir. 1984).  The Ninth Circuit found that, while some collective restraints may be necessary to producing a successful NFL product, such restraints must be closely tailored to advancing that purpose in order to withstand antitrust scrutiny.  The court enumerated objective considerations – then lacking in Article 4.3 – such as population,

economic projections, facilities, regional balance, fan loyalty, and team rivalries, among others, that should guide Defendants' territorial allocations of NFL teams in order to mitigate their collective actions under the rule of reason. In response to the Ninth Circuit's antitrust ruling against it, and to ensure future relocation decisions withstand antitrust scrutiny, the NFL subsequently adopted the Policy and Procedures for Proposed Franchise Relocations (the "Relocation Policies" or "Policies," attached hereto as Exhibit "2") that ostensibly incorporate the objective criteria that the Ninth Circuit ruled were lacking.

4. At the outset, the Relocation Policies expressly confirm that:

> each club's primary obligation to the League and to all other member clubs is to advance the interests of the League *in its home territory*. This primary obligation includes, but is not limited to, maximizing fan support, including attendance, in its home territory.

(emphasis added). The Relocation Policies further confirm that "no club has an 'entitlement' to relocate simply because it perceives an opportunity for enhanced club revenues in another location." In other words, the Relocation Policies first and foremost favor a team's home territory over relocation in order to promote team stability – which is thus clearly one of the procompetitive goals of the Relocation Policies - and all other considerations are viewed through that narrow lens. Because the Relocation Policies were adopted to address Defendants' antitrust violations, Defendants are not free to disregard them. When Defendants breach the Relocation Policies that are in place to mitigate their collective actions, they essentially re-violate the antitrust laws those Policies were designed to comply with. This has the effect of putting Defendants in the same place they were at the time the Ninth Circuit rendered its decision in *Los Angeles Memorial Coliseum* 35 years ago, *i.e.*, in violation of the antitrust laws. That is precisely what happened here.

5. The Raiders were financially successful in Oakland, received significant support from Oakland, and had one of the most loyal fan bases in the NFL in Oakland (also known as "Raider Nation"). Further, under both Oakland and Las Vegas' proposals, the Raiders would reportedly contribute $500 million toward building a new stadium, and both proposals involved roughly $600 to $650 million in other private financing.

6. Accordingly, under the Relocation Policies (which presumptively favor NFL teams staying in their home territories), there was simply no justification for a Raiders' relocation. However, Defendants openly ignored those Policies and approved the Raiders' relocation not because of some perceived lack of support by Oakland – or some concern about what Oakland was willing to pay or not pay toward a new or renovated stadium – but because of the supra-competitive payment Defendants coerced from Las Vegas which they would individually pocket by supporting the move.

7. Most egregiously, Defendants knowingly trampled on the Relocation Policies while publicly promising Oakland that they would negotiate in good faith. These statements were blatant misrepresentations and a direct violation of those Policies, *which require that Defendants negotiate in good faith*. From 2014 to 2017, the Raiders, through their owner representative, Mark Davis, publicly stated their desire to stay in Oakland (presumably to continue to reap massive profits at the expense of Raiders fans and the citizens of Oakland) while they affirmatively sought to move anywhere else: San Antonio, Los Angeles, San Diego, or Las Vegas. In fact, at one point, Davis simply stopped speaking to Oakland's Mayor, Libby Schaaf. By 2016, the NFL became directly involved through Eric Grubman ("Grubman"), its Executive Vice President in charge of stadia and relocations. Although Grubman supposedly "negotiated" with Oakland, he actually criticized Oakland's every move, including its $1.3 billion proposal for a new stadium near the Coliseum, the current home of the Raiders. The Raiders, the NFL, and ultimately the vast majority of NFL Clubs, were just stringing Oakland along as part of their collusive scheme to move the Raiders.

8. For decades, Defendants have tightly limited the supply and territorial allocation of the professional football teams in the United States by not only limiting the number of NFL Clubs in the United States, but also collectively controlling, and dictating under what terms and conditions, cities can have a professional football team presence. There are just 32 teams for the entire United States and thus cities fiercely compete to be a host city ("Host City"). A three-fourths vote of all 32 NFL Club owners is required to determine what city a team calls its home, and under what terms and conditions, including the price. The "price" includes not only hundreds

of millions of dollars in taxpayer money to be committed to building billion-plus dollar stadia to benefit the billionaire club owners, but also the "relocation fee" component that – in recent years – amounts to hundreds of millions of additional dollars that are paid to the other 31 NFL Club owners whose collective votes control whether a team relocates or stays put. Like the Raiders' move, the recent relocations of the Rams and Chargers also generated hundreds of millions in such fees for the remaining NFL Club owners, including Raiders owner Mark Davis. Notably, not a cent out of these fees is actually committed to directly accommodating any relocation-related expenses.

9. This is not a fair process in a competitive marketplace: It is a NFL-rigged process that, contrary to the Policies, promotes relocations in order to further line the pockets of NFL Club owners with millions of dollars paid by their billionaire competitors to the sole detriment of the Host Cities that are unwilling or unable to pay. It is, essentially, a leveraging of the NFL's monopoly power, used to extract value from municipalities through an auction that ignores the court-mandated objective relocation procedures. Every one of the Relocation Policies' considerations and factors supported a decision to keep the Raiders in Oakland. However, as a Host City, Oakland was unable to pay Defendants' cartel fee, so the Raiders are moving and paying a bogus $378 million relocation fee.

10. Worse yet, the Relocation Policies provide no real standard for setting the relocation fee other than it "will compensate other member clubs of the League for the loss of the opportunity appropriated by the relocating club and/or the enhancement (if any) in the value of the franchise resulting from the move." This guideline indicates that there must be some tangible and objective economic "value" to relocating a team to support a particular relocation fee. However, the factors to be supposedly considered are so vague that they support setting the fee as high as Defendants desire whether the relocating team gains or loses value from the move. But this has not always been the case; when the Rams left Los Angeles for St. Louis in 1995, they were charged $29 million, which clearly had more to do with the fact that there were 29 other NFL teams at the time, rather than any relative comparison of the value of the St. Louis market they took and the Los Angeles market they returned to the league. Here, objective factors indicate that

1    the Defendants lose significant value, with the Raiders moving from a market with proximity to

2    vibrant and wealthy economic hubs like Silicon Valley and San Francisco/Oakland to a city of

3    transient vacationers (Las Vegas), and from the 6th largest media market in the country

4    (encompassing Oakland) to the 40th (encompassing Las Vegas).  Thus, this case demonstrates the

5    sheer arbitrariness of the process by which Defendants set relocation fees and generally decide on

6    team relocations.

7         11.    The costs of Defendants' collective scheme is enormous, particularly to the public

8    who bear the brunt of Defendants' anti-competitive conduct – whether in hundreds of millions of

9    tax dollars committed to new stadia and paying Defendants' relocation fees, supra-competitive

10   ticket and seat licensing fees justified by gigantic and expensive stadia, or in lost investment and

11   business opportunities when an incumbent Host City, like Oakland, loses a team.  And none of this

12   even begins to consider the toll on the Host City fans who are not only emotionally invested in a

13   local team, but spend considerable sums of money on team merchandise.  Because of the great

14   demand for professional football, on the one hand, and Defendants' collective market power over

15   the allocation of professional football teams to Host Cities, on the other, Defendants can demand

16   supra-competitive terms – often involving new or renovated stadia at enormous cost to Host Cities

17   and ultimately the members of the public.  This is a case of leveraging of monopoly power,

18   resulting in an anticompetitive wealth transfer from municipalities to private business, in violation

19   of the antitrust laws.

20        12.    As a core part of the process of demanding these stadia, NFL Clubs, assisted by the

21   NFL, employ the relocation threat:  pay up or watch your team move somewhere else.  Other NFL

22   Clubs are only too happy to support these threats:  the relocation threats set the floor for all NFL

23   stadium negotiations and – when an NFL Club ultimately does relocate – the other NFL Clubs

24   receive illicit cartel payments in the form of the relocation fee and their own future threats to

25   relocate become all the more credible.  Since 2013, three NFL Clubs have made good on these

26   relocation threats:  the Rams moved from St. Louis to Los Angeles, the Chargers moved from San

27   Diego to Los Angeles, and the Raiders will be moving from Oakland to Las Vegas.  As a result,

28   the NFL Clubs have shared, or will share, in more than $1.4 billion in relocation fees.

13.     The NFL's boycott of Oakland violates the antitrust laws.  Specifically, the NFL controls the number of professional football franchises and where they are located, which gives them complete market power.  Also, as a cartel, courts have subjected the NFL to antitrust liability in the context of team relocations, and that liability compelled the NFL to adopt the Relocation Policies described above.  Contrary to these Policies, Defendants simply boycotted Oakland in favor of Las Vegas, even though Oakland is a lucrative market and made a significant stadium proposal to Defendants to keep the Raiders at home.  Once again, Defendants acted in this manner to collect the massive relocation fee that the Raiders' move generates.

14.     Moreover, Oakland was significantly handicapped in its effort to keep the Raiders by the fact that only a relocation would result in a payment to the other 31 NFL Clubs; there is no mechanism for a Host City to match these payments.  So if the Raiders remained in Oakland, the other NFL Clubs would receive nothing.  Through this decidedly skewed process, Defendants concertedly refused to deal with Oakland (like the Rams with St. Louis and the Chargers with San Diego before).  It was immaterial to Defendants that the Raiders were financially successful in Oakland, received significant support from Oakland, and had one of the most loyal fan bases in the NFL, the Raider Nation.  Maximizing their cartel fee – ultimately at the expense of the consuming public and taxpayers – is what really matters to Defendants.

15.     The Defendants' unlawful conduct has caused Plaintiff significant injury and loss.  Among other things, Plaintiff has lost the value of its significant investment in the Raiders, is burdened with a stadium of significantly diminished value, and has lost the revenues generated by the Raiders' continuing presence.  Defendants disregarded every objective factor in the Relocation Policies when they collectively agreed to relocate the Raiders from Oakland, thus concertedly boycotting and refusing to deal with Oakland on objective terms in an effort to maximize their payments, as well as leveraging their monopoly power, by charging supra-competitive prices to another host city (Las Vegas) and the consuming public (fans) for the presence of a professional football team.  Because Defendants' collective action was not grounded in objective criteria and violated their own Relocation Policies, it lacks any pro-competitive justifications.

/ / /

16.     Accordingly, Plaintiff brings this action for violations of the antitrust laws and breach of contract, among other claims, arising from Defendants' unlawful conduct.  As demonstrated in more detail below, because of this unlawful conduct, Plaintiff is entitled to, among other remedies, treble damages from Defendants under 15 U.S.C. §§ 1 and 15; a disgorgement of the enormous supra-competitive payments that Defendants have received, and will receive, from their unlawful conduct; and damages for Defendants' breach of their own Relocation Policies– *i.e.*, Policies to which Plaintiff, as the host of the Raiders, is an intended beneficiary.

## II.     PARTIES

17.     Plaintiff City of Oakland is a municipal corporation located in California.  Oakland is an indirect owner of the Coliseum at which the Raiders currently play professional football in the NFL.

18.     Defendant The National Football League is an unincorporated association consisting of the NFL Clubs.  The NFL's principal place of business is 345 Park Avenue, New York, New York 10065.

19.     The NFL Clubs are 32 separately-owned and independently-operated professional football franchises organized and operating for profit in the states set forth below.  In total, NFL Clubs play, or practice in, at least 23 different states and collectively generate revenue of approximately $14 billion:

| Defendant NFL Club Address | State of Organization (state of operation, if different) | NFL Club Name |
|---|---|---|
| Arizona Cardinals Football Club LLC 8701 Hardy Drive Tempe, Arizona 85284 | Delaware (Arizona) | Arizona Cardinals |
| Atlanta Falcons Football Club, LLC 4400 Falcon Parkway Flowery Branch, Georgia 30542 | Georgia | Atlanta Falcons |
| Baltimore Ravens Limited Partnership 1 Winning Drive Owing Mills, Maryland 21117 | Maryland | Baltimore Ravens |

| Defendant NFL Club Address | State of Organization (state of operation, if different) | NFL Club Name |
|---|---|---|
| Buffalo Bills, LLC<br>One Bills Drive<br>Orchard Park, New York 14127 | Delaware<br>(New York) | Buffalo Bills |
| Panthers Football, LLC<br>800 South Mint Street<br>Charlotte, North Carolina 28202 | North Carolina | Carolina Panthers |
| The Chicago Bears Football Club, Inc.<br>Halas Hall<br>1920 Football Drive<br>Lake Forest, Illinois 60045 | Delaware<br>(Illinois) | Chicago Bears |
| Cincinnati Bengals, Inc.<br>One Paul Brown Stadium<br>Cincinnati, Ohio 45202 | Ohio | Cincinnati Bengals |
| Cleveland Browns Football Company LLC<br>76 Lou Groza Boulevard<br>Berea, Ohio 44017 | Delaware<br>(Ohio) | Cleveland Browns |
| Dallas Cowboys Football Club, Ltd.<br>Cowboys Center<br>One Cowboys Parkway<br>Irving, Texas 75063 | Texas | Dallas Cowboys |
| PDB Sports, Ltd.<br>13655 Broncos Parkway<br>Englewood, Colorado 80112 | Colorado | Denver Broncos |
| The Detroit Lions, Inc.<br>222 Republic Drive<br>Allen Park, Michigan 48101 | Michigan | Detroit Lions |
| Green Bay Packers, Inc.<br>1265 Lombardi Avenue<br>Green Bay, Wisconsin 54304 | Wisconsin | Green Bay Packers |
| Houston NFL Holdings, LP<br>Two Reliant Park<br>Houston, Texas 77054 | Delaware<br>(Texas) | Houston Texans |
| Indianapolis Colts, Inc.<br>7001 West 56th Street<br>Indianapolis, Indiana 46254 | Delaware<br>(Indiana) | Indianapolis Colts |
| Jacksonville Jaguars, LLC<br>One Alltell Stadium Place<br>Jacksonville, Florida 32202 | Delaware<br>(Florida) | Jacksonville Jaguars |
| Kansas City Chiefs Football Club, Inc.<br>One Arrowhead Drive<br>Kansas City, Missouri 64129 | Texas<br>(Missouri) | Kansas City Chiefs |

| Defendant NFL Club Address | State of Organization (state of operation, if different) | NFL Club Name |
|---|---|---|
| Chargers Football Company, LLC<br>3333 Susan Street<br>Costa Mesa, California 92626 | California | Los Angeles Chargers |
| The Rams Football Company, LLC<br>29899 Agoura Road<br>Agoura Hills, California 91301 | Delaware<br>(California) | Los Angeles Rams |
| Miami Dolphins, Ltd.<br>7500 SW 30th Street<br>Davie, Florida 33314 | Florida | Miami Dolphins |
| Minnesota Vikings Football, LLC<br>9520 Viking Drive<br>Eden Prairie, Minnesota 55344 | Delaware<br>(Minnesota) | Minnesota Vikings |
| New England Patriots LLC<br>One Patriot Place<br>Foxborough, Massachusetts 02035 | Delaware<br>(Massachusetts) | New England Patriots |
| New Orleans Louisiana Saints, LLC<br>5800 Airline Drive<br>Metairie, Louisiana 70003 | Delaware<br>(Louisiana) | New Orleans Saints |
| New York Football Giants, Inc.<br>Timex Performance Center<br>1925 Giants Drive<br>East Rutherford, New Jersey 07073 | New York<br>(New Jersey) | New York Giants |
| New York Jets LLC<br>1 Jets Drive<br>Florham Park, New Jersey 07932 | Delaware<br>(New Jersey) | New York Jets |
| The Oakland Raiders,<br>A California Limited Partnership<br>1220 Harbor Bay Parkway<br>Alameda, California 94502 | California | Oakland Raiders |
| Philadelphia Eagles, LLC<br>1 Novacare Way<br>Philadelphia, Pennsylvania 19145 | Pennsylvania | Philadelphia Eagles |
| Pittsburgh Steelers LLC<br>3400 South Water Street<br>Pittsburgh, Pennsylvania 15203 | Pennsylvania | Pittsburgh Steelers |
| Forty Niners Football Company LLC<br>4949 Centennial Boulevard<br>Santa Clara, California 95054 | Delaware<br>(California) | San Francisco 49ers |
| Football Northwest LLC<br>12 Seahawks Way<br>Renton, Washington 98056 | Washington | Seattle Seahawks |

| Defendant NFL Club Address | State of Organization (state of operation, if different) | NFL Club Name |
|---|---|---|
| Buccaneers Team LLC<br>One Buccaneer Place<br>Tampa, Florida 33607 | Delaware<br>(Florida) | Tampa Bay Buccaneers |
| Tennessee Football, Inc.<br>460 Great Circle Road<br>Nashville, Tennessee 37228 | Delaware<br>(Tennessee) | Tennessee Titans |
| Pro-Football, Inc.<br>21300 Redskin Park Drive<br>Ashburn, Virginia 20147 | Maryland<br>(Virginia) | Washington Redskins |

## III.    JURISDICTION AND VENUE

20.    This is an action for violations of federal antitrust law, including 15 U.S.C. § 1. Accordingly, this Court has subject matter jurisdiction over this proceeding and all claims asserted herein pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction), 1337 (antitrust jurisdiction) and 1367(a) (supplemental jurisdiction).

21.    Venue is proper in this district under 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391 because:  (i) each of the Defendants transact business, committed an unlawful or tortious act, and/or are found, in this district; and (ii) a substantial portion of the conduct detailed herein, and which affected interstate trade and commerce, has been carried out in this district.

## IV.    INTRADISTRICT ASSIGNMENT

22.    Pursuant to the Northern District Civil Local Rule 3-2(d), the intradistrict assignment should be to the Oakland Division or the San Francisco Division.  This action arises in Oakland and the County of Alameda because a substantial part of the events giving rise to these claims occurred in the City of Oakland and Alameda County, and the property that is the subject of the action (the Coliseum) is situated in the City of Oakland and Alameda County.

## V.    FACTUAL ALLEGATIONS

### A.    Background

#### 1.    The NFL's Complete Market Power Over NFL Franchise Locations

23.    The NFL is a league of professional football franchises that places strict limits on the number of member clubs, controls where those clubs are located, and requires that all member

clubs share certain revenues and financial benefits of NFL participation. The NFL is made up of only 32 teams in 30 cities, and has been characterized as a "cartel" by the United States Court of Appeals for the Ninth Circuit. *Los Angeles Memorial Coliseum*, 726 F.2d at 1389. Past efforts by the NFL to claim it is a single entity have been strongly rebuffed by Courts, most notably when the Supreme Court ruled against this view 9-0 in *American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010).

24. With nearly 40 percent of Americans preferring football as their favorite spectator sport, it is not surprising that, at various times, there have been more than 30 cities vying to host professional football clubs. However, without any reasonable hope of a professional football league that can compete with the NFL, the market for owning or hosting such a club is significantly constrained. The NFL's complete control over professional football in the United States, combined with its ability to artificially limit the supply of professional football clubs, enables it to hold cities hostage by imposing anticompetitive conditions on being a Host City. As the Ninth Circuit recognized, the NFL acts as a cartel, limiting the supply of member clubs to create anticompetitive pressures on Host Cities and fans. *Id.*

25. Recently, NFL Clubs have increasingly used the NFL's complete market power to exert this anticompetitive pressure on Host Cities by demanding new and publicly subsidized stadia. These new stadia have sent the value of NFL Clubs soaring because of the significantly increased revenues that the NFL Clubs generate from higher ticket prices, personal seat licenses, luxury boxes and related amenities, services and revenue streams. The NFL is currently the world's most valuable sports league, generating approximately $14 billion in 2016 alone. In fact, Forbes magazine has estimated that NFL Clubs make up 29 of the world's 50 most valuable sports franchises. By 2027, the NFL projects that its revenues will be $25 billion per year.

26. As noted above, broken seats and leaky pipes are not driving team relocations; rather it is cartel payments from relocation fees and stadia designed to generate more profits. As proven in the case of the Coliseum, even when a Host City is willing and able to renovate or construct a new stadium, NFL Clubs opt to relocate as it is the only way the other NFL Clubs will

receive the cartel payment (the relocation fee).  Of course, this completely ignores the Relocation

Policies.  A sample of stadium funding by the Host City and NFL Club is set forth below:

| City | Year | Type | Cost (in millions of $) | Public funding (in millions of $) | Public funding (%) |
|------|------|------|------|------|------|
| Indianapolis | 2008 | New | $719 | $619 | 86.1% |
| Atlanta | 2017 | New | $1,400 | $594 | 42.4% |
| Minnesota | 2016 | New | $1,087 | $498 | 45.8% |
| Dallas | 2009 | New | $1,200 | $444 | 37.0% |
| Cincinnati | 2000 | New | $449 | $424 | 94.4% |
| Chicago | 2003 | Renovation | $587 | $387 | 65.9% |
| Arizona | 2006 | New | $455 | $310 | 68.1% |
| Seattle | 2002 | New | $461 | $300 | 65.1% |
| Houston | 2002 | New | $474 | $289 | 61.0% |
| Denver | 2001 | New | $400 | $289 | 72.3% |
| Kansas City | 2010 | Renovation | $388 | $263 | 67.8% |
| Buffalo | 2012 | Renovation | $271 | $227 | 83.8% |

27.     Part of an NFL team's demand for a new stadium is often a threat to move.  If a

Host City is unwilling or unable to pay for a new or renovated stadium, the club threatens to move

to one that will.  The NFL, as an organization, is only too happy to support such threats:  hard-ball

stadium negotiations set the floor for all NFL Clubs and – if a relocation decision is made and a

team receives a vote in favor of relocation from the NFL Clubs – each of those teams shares in the

benefits of the move through the relocation fee.  But the teaching of the Raiders litigation of the

1980s is that relocation threats based on subjective factors are condemned by the antitrust laws.

28.     The NFL and its Clubs hold closed-door meetings to collectively decide on whether

and where to move a team.  Under Section 4.3 of the NFL's Constitution – the agreement

governing the relationship between and among the 32 NFL Clubs – no NFL team can move from

one Host City to another without a three-fourths vote of approval from the NFL Clubs.  As an

award for saying "yes" to a relocation, NFL Clubs share among themselves the relocation fee that

is paid by the moving team.  In fact, since 2013, NFL relocations have resulted in the NFL Clubs

sharing in, and receiving cartel payments of, approximately $1.4 billion in relocation fees paid by

the moving team to the other NFL Clubs.

/ / /

29.     In a competitive market, demanding a new or renovated stadium would be a risky move for any NFL Club: The Host City could reject the demand and seek out a new team willing to play in the existing, upgraded or new stadium. In addition, both the demanding team and the Host City would face the prospect of "over building" in a market where stadium costs and ticket prices had reached an equilibrium. However, by acting together to limit the supply, and regulate the location of professional football teams, Defendants are able to demand new stadia regardless of what a competitive market would bear.

2.     The NFL's Relocation Process

(a)     *The Relocation Policies*

30.     The NFL's considerable power over relocation decisions has not gone unnoticed. In the early 1980s, the NFL violated federal antitrust laws in a well-known effort to prevent the Raiders from moving from Oakland to Los Angeles. In *Los Angeles Memorial Coliseum*, the Ninth Circuit affirmed a decision finding that the NFL had violated federal antitrust laws by voting against the Raiders' proposed relocation. In its ruling, the Ninth Circuit suggested that the NFL adopt policies that would guide relocation decisions in ways that comport with federal antitrust law:

> To withstand antitrust scrutiny, restrictions on team movement should be more closely tailored to serve the needs inherent in producing the NFL "product" and competing with other forms of entertainment. An express recognition and consideration of those objective factors espoused by the NFL as important, such as population, economic projections, facilities, regional balance, etc., would be well advised. [citation omitted] Fan loyalty and location continuity could also be considered.
>
> Some sort of procedural mechanism to ensure consideration of all the above factors may also be necessary, including an opportunity for the team proposing the move to present its case.

*Los Angeles Memorial Coliseum*, 726 F.2d at 1397.

31.     In the absence of such policies, the Ninth Circuit upheld a finding that the collective behavior of the NFL Clubs in voting to block the Raiders' relocation to Los Angeles had violated the antitrust laws as an unreasonable restraint of trade:

/ / /

The NFL argues that the requirement of [NFL Constitution] Rule 4.3 that three-quarters of the owners approve a franchise move is reasonable because it deters unwise team transfers. While the rule does indeed protect an owner's investment in a football franchise, no standards or durational limits are incorporated into the voting requirement to make sure that concern is satisfied. Nor are factors such as fan loyalty and team rivalries necessarily considered.

*The NFL claims that its marketing and other objectives are indirectly accounted for in the voting process because the team owners vote to maximize their profits.* Since the owners are guided by the desire to increase profits, they will necessarily make reasonable decisions, the NFL asserts, on such issues of whether the new location can support two teams, whether marketing needs will be adversely affected, etc. Under the present Rule 4.3, however, an owner need muster only seven friendly votes to prevent three-quarters approval for the sole reason of preventing another team from entering its market, regardless of whether the market could sustain two franchises. A basic premise of the Sherman Act is that regulation of private profit is best left to the marketplace rather than private agreement.

*Id.* at 1396-1397 (emphasis added).

32.     In response to the Ninth Circuit's holding in *Los Angeles Memorial Coliseum*, the NFL Clubs collectively agreed to amend the NFL Constitution by adding the Relocation Policies as an addendum to Section 4.3. The Policies seek to integrate the Ninth Circuit's suggestions in *Los Angeles Memorial Coliseum* into a set of requirements meant to ensure that the NFL's exercise of its control over relocation decisions complies with federal antitrust laws.

33.     The Relocation Policies expressly require that the NFL and NFL Clubs consider the conduct and interests of Host Cities in any decision to relocate a club. Indeed, the Relocation Policies affirmatively state that each NFL Club's "primary obligation" is to "advance the interests of the NFL in its *home territory*" (emphasis added). The Relocation Policies declare that because "League policy favors stable team-community relations, clubs are *obligated to work diligently and in good faith* to obtain and to maintain suitable stadium facilities in their home territories, and to operate in a manner that maximizes fan support in their current home community" (emphasis added).

34.     The Relocation Policies also require NFL team owners to consider the following factors, among others, with respect to voting on any relocation request:

- The extent to which the club has satisfied, particularly in the last four years, its principal obligation of effectively representing the NFL and serving the fans in its

current community; whether the club has previously relocated and the circumstances of such prior relocation;

- The extent to which fan loyalty to and support for the club has been demonstrated during the team's tenure in the current community;

- The adequacy of the stadium in which the club played its home games in the previous season; the willingness of the stadium authority or the community to remedy any deficiencies in or to replace such facility, including whether there are legislative or referenda proposals pending to address these issues; and the characteristics of the stadium in the proposed new community;

- The extent to which the club, directly or indirectly, received public financial support by means of any publicly financed playing facility, special tax treatment, or any other form of public financial support and the views of the stadium authority (if public) in the current community;

- The club's financial performance, particularly whether the club has incurred net operating losses (on an accrual basis of accounting), exclusive of depreciation and amortization, sufficient to threaten the continued financial viability of the club, as well as the club's financial prospects in its current community;

- The degree to which the club has engaged in good faith negotiations (and enlisted the League office to assist in such negotiations) with appropriate persons concerning terms and conditions under which the club would remain in its current home territory and afforded that community a reasonable amount of time to address pertinent proposals;

- The degree to which the owners or managers of the club have contributed to circumstances which might demonstrate the need for such relocation; and

- Whether the proposed relocation, for example, from a larger to a smaller television market, would adversely affect a current or anticipated League revenue or expense stream (for example, network television) and, if so, the extent to which the club proposing to transfer is prepared to remedy that adverse effect.

35. Host Cities, like Oakland, rely on these Relocation Policies to ensure that NFL Clubs stay committed to their home markets, comply with the antitrust laws, and provide Host Cities a fair and level playing field in any negotiations with the NFL and its home club.

(b)   *The Relocation Fee*

36. Among the other policies and procedures that NFL Clubs must follow in the relocation process, a relocating NFL Club must pay a relocation fee. NFL rules state that a relocating NFL Club will "ordinarily" be expected to pay a relocation fee "[i]f a club's proposal to relocate to a new home territory is approved." Ultimately, the non-relocating NFL owners determine the relocation fee, "if any, at the time [they approve[]any proposed club relocation."

The NFL Clubs' owners typically decide the amount of the relocation fee before a relocation vote is taken. In other words, the NFL owners decide in concert how much money they will receive for voting "yes" to allow an NFL Club to leave its Host City.

37. Tellingly, the relocation fee is a source of income that the NFL Club owners do not share; it is pure cartel payment that goes straight to the NFL Club owners' bottom lines when they together decide that a team should leave its Host City.

### 3. The Raider's History In Oakland

#### (a) *The Raiders' Identity Is Inextricably Linked With Its Oakland Fans*

38. The Raiders have been inextricably linked with Oakland since Oakland was awarded the franchise in 1960. In fact, the Oakland community itself chose the club's name: "Raiders" reflects the history of Oakland, celebrating the rough-and-tumble merchant marines who came ashore on Oakland's blue-collar eastside of the San Francisco Bay and their banter after off-loading cargo from their ships.

39. Similarly, the Raiders' national identity and image reflect the grit and hard-nosed passion of their Oakland fans. The now famous Raiders image originated in the 1960s and 1970s, and, in part, came from their renegade image cultivated in the old AFL. From there, the Raiders' tough play on the field followed. The Oakland fans reflected their home club's toughness by dressing from head-to-toe in black and silver, and coined the term "Raider Nation" to describe their unity. An especially passionate contingent of the club's fans were infamously dubbed "The Black Hole" for dressing in costume and cheering with ferocity at games. Today, Raiders' fans are famous throughout popular culture for being some of the most devout, dedicated, loyal, and passionate fans in all of sports. The Raiders and NFL, of course, have not been shy about monetizing the image created by, and through, the consistent passion of its incredibly loyal Oakland fan base.

#### (b) *The Hectic Al Davis Years*

40. In the mid-1960s, Al Davis took an ownership stake in the Raiders and became one of three general partners of the club. In 1966, the Raiders began playing in the Coliseum. In

1  1972, Davis revised the partnership agreement to make himself the managing general partner of

2  the Raiders with near-absolute control over franchise operations.

3       41.     No later than 1979, the Raiders began negotiating with the Los Angeles Coliseum

4  to relocate the club.  In 1980, Davis signed a memorandum of agreement to move the Raiders to

5  Los Angeles.  Up until Davis officially agreed to the relocation of the Raiders, Oakland had

6  engaged in good faith negotiations to upgrade the Coliseum (in Oakland).  Oakland and the

7  Raiders at one point came to terms on an agreement for the Raiders to stay, when the Raiders

8  suddenly submitted new demands that caused negotiations to collapse.  The NFL subsequently

9  rejected the Raiders' proposed move to Los Angeles, and the aforementioned *Los Angeles*

10  *Memorial Coliseum* litigation followed.  The Raiders officially moved to Los Angeles on

11  November 16, 1982.

12       42.     Soon after the relocation, history repeated itself when Al Davis and the Raiders

13  began bickering with their new Host City of Los Angeles.  By August 1987, Davis agreed to move

14  the club out of the Los Angeles Coliseum to Irwindale, California for, in part, a $10 million cash

15  advance.  Despite ultimately never moving the team to Irwindale, Davis kept the advance.

16       43.     After the Irwindale deal fell through, Sacramento and Oakland became potential

17  cities for a Raiders move.  Following a series of negotiations with Los Angeles, Sacramento, and

18  Oakland, Al Davis conditionally agreed to move the club back to Oakland in March 1990.

19       44.     Even with the conditional agreement in place, Al Davis continued his flirtations

20  with other markets.  Within six months, he reneged and agreed to a 20-year lease in Los Angeles.

21  Eventually, that deal fell through.  Davis continued negotiating with a number of potential Host

22  Cities, including Los Angeles, Oakland and Orlando.

23       45.     On January 17, 1994, the Northridge Earthquake struck Los Angeles, severely

24  damaging the Los Angeles Coliseum.  In May 1994, Al Davis signed a one-year contract with

25  Oakland.  The contract stipulated that the Raiders would play in Oakland if repairs to the Los

26  Angeles Coliseum were not completed in time for the following season.  The contract was later

27  extended to two years.

28  / / /

46. In April 1995, Al Davis reached a tentative agreement with Hollywood Park to build a stadium in Inglewood, California. That deal also failed.

47. In May 1995, Oakland officials met with the Raiders in an effort to bring the club back to Oakland. On June 23, 1995, the Raiders signed an agreement to play in the Coliseum (in Oakland). The terms of the agreement included, among others:

- A 16-year lease with $50,000 annual rent;

- Oakland agreeing to offer a $31.9 million relocation and operating loan;

- Oakland committing up to $10 million to the construction of a new training facility;

- Oakland offering up to $85 million for stadium modernization efforts to be financed by bonds;

- Fans paying a one-time fee in the range of $250 to $16,000 for the right to buy season tickets for 10-years ("personal seat licenses");

- The Raiders receiving 100% of ticket and luxury suite revenue;

- The Raiders and the Coliseum sharing club seat and membership fees for the first 10-years, after which the Raiders would receive 100% of that revenue;

- The Raiders and the Coliseum sharing concessions, parking, and stadium naming rights revenue; and

- A $1 surcharge on all tickets sold to benefit Oakland schools and other public services.

48. Despite having just signed a generous 16-year pact with Oakland, Al Davis almost immediately sought to break the Oakland lease. As a result, in 1997, Oakland was forced to file a suit that, in part, sought to declare the agreement with the Raiders valid and enjoin the club from leaving Oakland. The Raiders countersued seeking to break the lease. The countersuit was dismissed. Nonetheless, rumors soon emerged that the Raiders were seeking to move to either Los Angeles or Chicago.

49. Al Davis' never-ending series of lawsuits continued. In 1999, Davis unsuccessfully sued the NFL for allegedly sabotaging its plans for a new stadium in Los Angeles. In 2000, Davis countersued Oakland for supposedly fraudulently inducing the Raiders into moving back to Oakland. The claims against Oakland were ultimately dismissed.

/ / /

/ / /

B.  **The Raiders' Unlawful Relocation From Oakland**

50.  Despite Al Davis' hectic ownership style, and a Raiders team that only managed 29 victories in 112 games from 2003 to 2009, the remarkably loyal Oakland community continued to passionately support their home team year after year.  However, unbeknownst to Plaintiff, the Raiders – with the NFL's full support – were plotting to leave.

51.  Tellingly, as early as 1998, Mark Davis, Al Davis' only child and the heir apparent to the Raiders, purchased the Internet domain name, "LasVegasRaiders.com."  He subsequently renewed the domain name yearly.  Within two years, Mark Davis also purchased a cellphone number with a Las Vegas area code.

1.  The Raiders And NFL Decide To Leave Oakland

52.  In December 2008, NFL Commissioner Roger Goodell ("Goodell") announced that the NFL wanted the Raiders to receive a new stadium.  Nonetheless, in November 2009, the Raiders agreed to extend their lease to stay in the Coliseum.

53.  Soon thereafter, however, Raiders officials began publicly discussing the possibility of sharing a facility with the San Francisco 49ers in Santa Clara, California.  In addition, in April 2010, Anschutz Entertainment Group, a sports and entertainment conglomerate, proposed building a football stadium in downtown Los Angeles for several potential NFL Clubs, including the Raiders.

54.  On October 8, 2011, Mark Davis assumed control of the Raiders after his father, Al Davis, passed away.

55.  In June 2012, the NFL sent a memo to the NFL Clubs providing guidelines for any potential relocation to Los Angeles.  The memo was believed to be largely addressed to the Raiders, Rams and Chargers, as it was widely believed that the NFL wanted those clubs to leave their Host Cities.  In fact, the NFL had made it all but a foregone conclusion that those clubs would be leaving their Host Cities.

56.  The NFL's June 2012 memo made clear that two clubs would move into the Los Angeles market, as the NFL advised teams that relocation approval would be contingent on any

proposed Los Angeles stadium "being able to host two teams." The Raiders, Rams and Chargers would later apply to relocate to Los Angeles.

57.     In 2014, the Raiders agreed to a short-term lease to remain in Oakland. Soon thereafter, Mark Davis began meeting with high-level NFL officials regarding where he would relocate the Raiders. In July 2014, he informed NFL Executive Vice President Grubman, "I'm going to Vegas, baby!" This declaration came despite the NFL's long-time stance against gambling. For example, in 2012, Goodell testified that gambling was number one on his list of threats to the integrity of professional football in the United States. And, in a May 14, 2018 press release, the NFL reasserted its "long-standing and unwavering commitment to protecting the integrity" of professional football against the threat of gambling. Nevertheless, the NFL and its owners would soon throw their full support behind moving one of its marquee teams to "Sin City" and the heart of gambling: Las Vegas, Nevada.

2.     The Raiders' Pretextual And Bad Faith Negotiations With Oakland

58.     Despite all his backdoor dealings and public maneuvering, Mark Davis claimed that he was "trying everything possible to get something done in Oakland." Davis asserted that "99 percent of my interests and energy are going towards getting something done [in Oakland]." In 2014, Oakland proposed donating land to the Raiders for a new stadium even though the city was still paying off the debt outstanding on upgrades to the Coliseum requested by the Davis family. Later, by early 2015, Oakland proposed a $500 million renovation of the Coliseum (to which Oakland would have contributed significantly) in an effort to retain the Raiders.

59.     On May 19, 2015, after the NFL's Spring Meeting, Mark Davis publicly announced that he was willing to commit $500 million for a new $900 million stadium in Oakland. He then asserted that Oakland would be required to fill the $400 million funding gap. Despite the enormity of Davis' demand, Oakland continued to negotiate with the Raiders.

60.     On January 4, 2016, the Raiders, Chargers and Rams each officially filed for relocation to Los Angeles. Prior to these filings, an NFL.com reporter, Ian Rapoport, reported that any NFL Club that relocated to Los Angeles would be required to pay a $550 million relocation

fee.  Since 2 teams were going to Los Angeles, the total relocation fee for that Host City would be $1.1 billion.

61.     Almost two weeks later, the NFL Club owners voted 30 to 2 to allow the Rams to move to Los Angeles for the 2016 season.  As the NFL had already determined that two teams would leave their Host Cities for Los Angeles, the Chargers were given a one-year option to join the Rams in Los Angeles.  If the Chargers elected not to exercise that option, the Raiders would then be given a one-year option to relocate to Los Angeles.  Remarkably, prior to the vote, all three clubs signed a waiver, agreeing not to sue the NFL if their Los Angeles relocation proposal was rejected.

62.     On January 29, 2016, a few weeks after Mark Davis announced his commitment to Oakland at an NFL-sponsored town hall meeting, Davis privately met with billionaire casino mogul Sheldon Adelson ("Adelson") to discuss funding for a $1.7 billion stadium for the Raiders in Las Vegas.  On April 28, 2016, while speaking before the Southern Nevada Tourism Infrastructure Committee, Mark Davis again announced his desire to move the Raiders from Oakland to Las Vegas and pledged to commit $500 million towards a new stadium, $200 million of which was an NFL loan.  Mark Davis said, "We're not using Las Vegas as a bargaining chip.  I would never do that.  This is real."

63.     By May 2016, multiple owners were publicly stating their support for a Raiders' move to Las Vegas.  Mark Davis declared, "I've given my commitment to Las Vegas and if they can come through with what they're talking about doing, then we'll go to Las Vegas."  In August 2016, Adelson convinced the Nevada state legislature to create a bill that appropriated $750 million in public money, which had originally been intended to fund a public project, to a professional football stadium.  Later that month, the Raiders filed a trademark application for the "Las Vegas Raiders."

64.     In September 2016, Goodell publicly stated that he hoped the Raiders would come to terms on a stadium in Oakland.  Yet, that very same month, Jerry Jones, the owner of the Dallas Cowboys and one of the most powerful and influential owners in the NFL, told Nevada lawmakers to be aggressive in landing the Raiders.  Then, less than a month later at an NFL league meeting,

1　Mark Davis stated, "I made a promise to [the Nevada Governor], and if he comes through with the

2　financing, I'll push through with the relocation."

3　　　　65.　Though the Raiders and NFL had given up on Oakland in express contravention of

4　the Relocation Policies, Oakland had not given up on the Raiders.  In late November 2016, an

5　investment group led by former NFL players Ronnie Lott ("Lott") and Rodney Peete, in

6　partnership with Fortress Management Group, pledged $600 million to build a new stadium near

7　the Coliseum.  This offer was $200 million more than the $400 million funding gap that Mark

8　Davis claimed Oakland needed to fill.  Then, on December 13, 2016, Oakland officials voted to

9　enter into negotiations with Lott's investment group on a proposed $1.3 billion stadium project.  A

10　total of $350 million in public funds was earmarked for the proposal.  The plan was to have Lott's

11　group contribute $400 million and the Raiders contribute the $500 million they had earlier

12　promised to commit to a new stadium (the "Lott Proposal").

13　　　　66.　The Lott Proposal also included the possibility that Mark Davis would eventually

14　sell some part of the team to the Lott group.  In a league marked by a lack of African-American

15　representation in leadership positions, this should have been heralded as a positive development.

16　Indeed, the NFL has long applied the "Rooney Rule" to NFL Clubs, which rule requires each team

17　to interview at least one minority coaching candidate before filling a head coaching vacancy.

18　　　　67.　Instead of taking the Lott Proposal seriously, Mark Davis passed off his

19　responsibility to deal with Oakland officials to an NFL representative, Grubman, while Davis

20　followed through with his and the NFL's predetermined plan to move the Raiders to Las Vegas.

21　Of course, Grubman almost immediately dismissed the Lott Proposal as "not yet a proposal" and

22　expressed his "doubts" regarding its workability.  Though Grubman told Davis that he had an

23　"obligation" to listen to Oakland, no one actually listened.  In fact, at a closed-door NFL meeting,

24　Marc Badain, a high-level Raiders official, referred to the Lott Proposal – a proposal that could

25　have finally introduced African-American ownership into the NFL for the first time in the league's

26　history – as a "political, cover-your-ass joke."  Badain announced that "it would have been better

27　if [Oakland] offered nothing."  Contrary to that assertion, the Lott Proposal was real.

28　/ / /

68.     On January 19, 2017, the Raiders officially filed an application with the NFL to relocate to Las Vegas.  At the time of the filing, Jim Wunderman, president and chief executive of the Bay Area Council, a business and public policy group, summarized the sentiments of Oakland:

> The Bay Area, millions of stalwart fans and the business community are not giving up on keeping the Raiders here where they belong[.]  We continue to believe that a deal can be reached to build a modern stadium complex that the Raiders deserve and that benefits Oakland.  We urge the Raiders, the NFL, and Oakland to work together to find an agreement that can benefit everyone and avoid the disruption and pain of a costly move.  Relocating a franchise with the deep roots and storied history that the Raiders have here in the Bay Area would be a disaster for the community.

### 3.     Defendants' Collusive Relocation Fee Determination And Relocation Vote

69.     On March 6, 2017, Bank of America agreed to provide necessary financing for the Raiders' Las Vegas stadium.  On that same day – a full 21 days before the NFL owners were set to vote on the Raiders' proposed Las Vegas relocation – the NFL owners convened to determine the amount of the Raiders' relocation fee.  The meeting was effectively an auction for a "yes" vote: the relocation fee was bid up until enough NFL owners were satisfied with their personal payments to vote "yes."  Revealingly, according to an ESPN report, one NFL owner who was opposed to the Raiders' Las Vegas relocation "wouldn't stop talking about how high the fee needed to be."  Goodell eventually cut off the owner and stated, "[s]o let me make sure I understand:  You're opposed to the relocation, but you want to vote on the relocation fee?"  Ultimately, the NFL Clubs agreed that the cost of their approval for a Raiders' move to Las Vegas was $378 million.

70.     Mark Cuban ("Cuban"), an entrepreneur and owner of the NBA's Dallas Mavericks, expressed the thoughts of many when he publicly stated that "[t]here's just no good reason" for the Raiders to move to Las Vegas.  Oakland is a far more economically attractive market than Las Vegas, as Oakland is based in the United States' 6th largest media market, whereas Las Vegas is in the 40th.  Additionally, as Cuban noted, Las Vegas is a transient vacation city.  Oakland, on the other hand, is an emerging metropolis located nearby the booming city of San Francisco (home of major tech companies Salesforce, Uber and Twitter), the East Bay area (which includes Fremont, home of Tesla Motors), and, of course, Silicon Valley.

71. In March 2017, Oakland submitted final plans to the NFL regarding the Lott Proposal, and Mayor Schaaf made a presentation to a joint meeting of the NFL's Stadium and Finance Committees that outlined the terms of the Lott Proposal, as well as Oakland's significant financial and other contributions to the Raiders. "We're not giving up in the fourth quarter," Mayor Schaaf wrote in a statement.

72. Unfortunately, the NFL and Raiders had fixed the game before it ever started, negotiating all along in bad faith. The same day that Mayor Schaaf made her final presentation, Goodell wrote to her, "the information sent today does not present a proposal that is clear and specific, actionable in a reasonable timeframe, and free of major contingencies" and "[a]ll of these efforts, ours and yours, have not yet identified a viable solution." The Raiders – in an agreement decided among the other NFL Clubs and in direct contravention of the Relocation Policies – for all intents and purposes had already made the move.

73. The NFL voted on the Raiders' relocation at its annual meeting in March 2017. On March 23, 2017, Oakland Mayor Schaaf wrote Grubman and Goodell of the NFL to provide further information regarding the Lott Proposal. On March 26, 2017, Mayor Schaaf also wrote the NFL Club owners, urging them to consider Oakland's superior market and plans for a new stadium. Her plea revealed the true dedication of Oakland to the Raiders:

> I write to you on the eve of what may be one of the most critical decisions in the National Football League's history. While I write on behalf of my community, I also ask you to consider deeply the lasting impact your choice will have on the future and legacy of the broader NFL community. This decision will not just be the next chapter in the history of one of the most storied franchises in the league, the Oakland Raiders, it will also impact the town where that tradition was forged – Oakland, California.

74. She also noted that if the NFL approved the Raiders' move, *"[t]his will be the first time ever where the NFL has abandoned an existing market which is bringing a fully financed new stadium to the table."* (emphasis in original). Although Mayor Schaaf recognized that Oakland was "unable to provide the level of public subsidy Nevada offers," she publicly hoped for a process that involved more than just money:

/ / /

The NFL is more than a business. You have an obligation to recognize that professional football teams are the lifeblood, culture and identity of the places where they play. Your own policies state you will not remove teams from their home markets when a viable alternative to stay exists. The trust of fans and the league's reputation have already been damaged by recent decisions on the Rams and Chargers. Another betrayal in a community as valuable and deserving as the Bay Area will further destroy fan loyalty and the NFL's brand. I know this because I hear it every day from NFL fans in my community, and others who care about the league and what it means to our national culture.

75.    Mayor Schaaf, Oakland and the Raider Nation were resoundingly disappointed. The NFL Clubs voted 31 to 1 to approve the Raiders' relocation. The NFL, indeed, was more than a business: it was an unlawful cartel violating its own Relocation Policies and abusing its complete control of the relevant market in the pursuit of anticompetitive payments.

76.    The lone dissenting vote, Dolphins' owner Stephen Ross, effectively admitted that the NFL had ignored the purpose of the Relocation Policies:

[W]e as owners and as a League owe it to the fans to do everything we can to stay in the communities that have supported us until all options have been exhausted. . . . I believe when you own a team, you're a steward for the city . . . . I just don't think everything was done to try and stay in Oakland.

77.    With the Las Vegas deal a *fait accompli*, the other NFL Clubs began to circle the wagons. Jerry Jones, the owner of the Cowboys, told ESPN that he believed the NFL could be "successful" in Las Vegas. Robert Kraft, owner of the Patriots, stated that a move to Las Vegas "would be good for the NFL. I know Mark Davis has tried so hard in Oakland [sic] I want to support him." Jim Irsay, owner of the Colts, claimed that "[t]here isn't any opportunity in Oakland" and that in Las Vegas, "[t]here is a real want and real enthusiasm from the powers that be that run that state to have an NFL team." Apparently, gambling was no longer an issue, despite the NFL's historic and "unwavering" anti-gambling stance as alleged above.

78.    Of course, no one associated with the NFL, including Mark Davis, "tried hard" to keep the Raiders in Oakland. In fact the opposite occurred; the Relocation Policies had been blatantly ignored throughout the process. The Relocation Policies do not allow the NFL and the NFL Clubs to shut out a viable Host City from the process and it does not award an NFL Club to the highest bidder. Instead, those Policies consider:

- whether an NFL Club's fans are "loyal." *Answer*: Raider Nation encompasses some of the most loyal fans in the country;

- whether the Raiders had, in the prior four years, represented the NFL and served their fans in Oakland. *Answer*: Putting aside the conduct of Mark Davis, and focusing on the team members themselves, the Raiders had indisputably represented the NFL and served Raider Nation, in Oakland;

- "the adequacy of the stadium in which the [NFL Club] played its home games in the previous season; and the willingness of the stadium authority or the community to remedy any deficiencies in or to replace such facility." *Answer*: The Coliseum was more than adequate - especially with the proposed renovations - for the Raiders and, if not, Oakland was willing to build a new $1.3 billion stadium;

- "the extent to which the [NFL Club,] directly or indirectly, received public financial support by means of any publicly financed playing facility, special tax treatment, or any other form of public financial support and the views of the stadium authority (if public) in the current community." *Answer*: The Raiders received significant public support from Oakland, including loans for operations, training facilities and monies for stadium renovations;

- the NFL Club's "financial performance, particularly whether the club has incurred net operating losses (on an accrual basis of accounting), exclusive of depreciation and amortization, sufficient to threaten the continued financial viability of the club." *Answer*: The Raiders always made money in Oakland, and it remains an extremely valuable and growing market;

- "the degree to which the [NFL Club] has engaged in good faith negotiations (and enlisted the League office to assist in such negotiations) with appropriate persons concerning terms and conditions under which the club would remain in its current home territory and afforded that community a reasonable amount of time to address pertinent proposals." *Answer*: The Raiders and NFL acted in bad faith in their negotiations with Oakland, deceived Oakland as to the Raiders' true intention to move, gave Oakland no time to address any purported concerns the Raiders had with the Coliseum or Oakland in general, rejected outright Oakland's $1.3 billion proposal for a new stadium (without giving Oakland any reasonable amount of time to address any of the Raiders or NFL's purported issues with that proposal), and never made any good faith proposal of their own.

Pursuant to the Relocation Policies, the question of the Raiders' relocation was not even close: the Raiders were required to stay in Oakland.

79. In sum, every objective factor to be considered in the Relocation Policies favored a stay in Oakland. The Oakland community and "Raider Nation" are among the most loyal and passionate fans in the world. Oakland's many proposals, and particularly the Lott Proposal, were more than generous and showed Plaintiff's eagerness to work with, and support, the Raiders. The Raiders received significant public support while playing in Oakland and were profitable every

1  year. Further, Plaintiff negotiated in good faith and went to incredible lengths to keep the Raiders

2  in its far superior and growing market. What Plaintiff could not do was offer the NFL owners the

3  $378 million cartel payment in the form a relocation fee.

4     **C.**    <u>The Unlawful Conspiracy Behind The Raiders' Relocation</u>

5     80.    The NFL's approval of the Raiders' relocation – and its approval of the relocations

6  of the Rams and Chargers as well – is a classic act of a cartel misusing market power to achieve

7  monopolistic cartel payments and generating anticompetitive profits. By forcing Host Cities to

8  choose between paying those monopolistic cartel payments – which far exceed the marginal costs

9  of operating a professional football team – and losing the football team their citizens cherish, the

10  NFL places Host Cities in a Hobson's choice that all consumers of monopolistic goods and

11  services face: pay up, way up, or lose. Further, with payments in the neighborhood of $750

12  million or more, only the wealthiest cities stand a chance of being an NFL Club host. The

13  antitrust laws, and the Relocation Policies, were adopted to prevent this exact kind of economic

14  bullying and ensure a competitive NFL relocation system.

15     81.    In a competitive marketplace, NFL Clubs could not demand billion dollar stadia

16  with premium seating and amenities; instead, they could only seek the repairs and renovations

17  necessary to the maintenance of the NFL brand and each NFL Club. But the NFL is anything but

18  a competitive market. Once again, in a country with over 325 million citizens, the NFL currently

19  limits its product to 32 clubs, and courts have repeatedly found that professional football is its own

20  market. For a fan of professional football, the NFL is the only game in town.

21     82.    And fans pay. As noted above, the vast majority of the costs of stadia are paid for

22  by Host Cities. However, the fans pay as well, above and beyond their role as tax payers within

23  the Host Cities. For example, four new NFL stadia were built between 2007 and 2012. Ticket

24  prices for those newly-housed franchises "jumped by an average of 26 percent in the season those

25  stadia opened, and . . . many fans [also] paid thousands of dollars more in personal seat licenses

26  merely for the right to buy [those] tickets." Two of the clubs, the Jets and the Giants, "increased

27  their average ticket prices by 32 and 26 percent, respectively" in 2010, their first season in their

28  new shared stadium, versus a five percent jump throughout the NFL.

83.     Likewise, when the Cowboys moved into their new stadium in 2009, the franchise raised ticket prices by an average of 31 percent, compared to a 4 percent jump throughout the NFL.  When the Colts moved to their new stadium in 2008, they raised ticket prices by an average of 14 percent, against the NFL average of 8 percent.  At their new stadium, the 49ers have increased average season ticket prices by 45 percent.  In 2011, the newly-housed Jets, Giants, Cowboys and Colts ranked among the NFL's seven most expensive clubs in terms of the cost to attend a game.  Current predictions are that Raiders' ticket prices will similarly skyrocket in cost in the new Las Vegas stadium.

84.     Because of the complete control that the NFL has over the supply of NFL franchises, demand for stadium tickets is effectively inelastic:  *i.e.*, the value of higher ticket prices far exceeds any reduction in demand caused by the higher prices, in part because demand is generally well above stadium capacity, so even if some existing fans choose not to renew their season tickets, others are eager to buy.  In short, NFL fans have to pay anticompetitive prices if they want to attend games and, if they cannot, they can stay home:

> The NFL is a business that . . . generate[d] more than $10 billion in revenues in 2014.  With media rights more or less in place for the next nine years, if the league is going to meet its projected revenue goals, ticket prices remain an area fans can expect to see annual increases.  Demand exceeds inventory.

> It doesn't matter if games are no longer affordable for "Joe football."  The 2014 season begins with him enjoying contests from the comfort of his home, and the NFL doesn't mind.

H. Bloom, *NFL Increases Ticket Prices Because It Can*, Sporting News, Sept. 8, 2014.

85.     No NFL Club could demand these anticompetitive prices alone; indeed, holding Host Cities hostage requires the collective effort of all the NFL Clubs.  As the United States Court of Appeals for the Second Circuit has recognized, such industry-wide agreements tend to "stiffen the spines" of otherwise competing interests.  *U.S. v. Apple*, 791 F.3d 290, 305 (2d Cir. 2015).  By acting in concert – in an agreement in violation of Section 1 of the Sherman Act – the NFL Clubs "stiffen" their "spines" to ensure that all Clubs demand the same of the Host Cities and use the same threats of relocation.

/ / /

86.     Defendants' conduct in approving the Raiders' relocation is a classic example of an unlawful group boycott (*i.e.*, an agreement by a group of competitors to boycott a particular buyer or group of buyers).  Here, the NFL Clubs, as a group, are boycotting Host Cities, like Oakland, who will not succumb to their demands.  In fact, Oakland and similarly situated cities and communities are not only losing their home teams, they have no chance of being a Host City in the future unless they agree to pay the NFL's always increasing supra-competitive prices.  Notably, all three cities that lost an NFL Club in recent years (St. Louis, San Diego and Oakland) currently have no other NFL team prospects.  Defendants' boycott of these Host Cities is a core violation of the antitrust laws and the NFL's own Relocation Policies, which were meant to promote existing Host City relationships and fan loyalty.

87.     Defendants' conduct in supporting and approving the Raiders' demands on Oakland and ultimate relocation to Las Vegas is also a horizontal price fixing scheme.  Defendants have collectively acted to increase the prices paid by Host Cities for the ability to host an NFL team to sums that far exceed the prices any Host City would have to pay in a competitive NFL marketplace.  Specifically, the Defendants met and agreed collusively to impose the $378 million Relocation fee at the NFL annual meeting in March 2017.  As a collective, the Defendants leveraged their monopoly position as the sole major football league in the United States.

### D.     The Relevant Market Applicable To Defendants' Misconduct

88.     The relevant market in this action is the market of all Host Cities offering, and all cities and communities that are willing to offer (*i.e.*, potential Host Cities), home stadia and other support to major league professional football teams in the geographic United States.

89.     With respect to the product market, as alleged above, there is no substitute for an NFL franchise.  There is no other major professional football league in the United States.  The Canadian Football League is no substitute for the NFL and even to the extent the CFL has made limited attempts to enter the United States, those efforts have failed.  NFL football is a unique market as recognized in *Los Angeles Memorial Coliseum*.  The Defendants wholly control the process of establishing NFL teams, their locations, and the stadia in which they play.  If a Host City, or a potential Host City, does not abide by the process controlled by Defendants, then they

1    stand to lose their franchise or not get selected as a location.  Those Host Cities cannot go

2    elsewhere.  For example, an NFL Host City faced with the situation that Oakland now faces

3    cannot shift its host status to another professional sport like Major League Baseball.  Not only is

4    the entire Host City status tied up in the NFL process, a professional baseball team is not a

5    substitute for a professional football team.

6          90.     With respect to the geographic market, the vast majority of demand for the NFL is

7    in the United States, and the teams are located in the United States.  Despite some games now

8    being played abroad, no NFL team has based itself in a foreign city, and at the time of the anti-

9    competitive conduct alleged herein, the United States market dominated professional football, and

10   there was no substitute outside of the United States.  Moreover, Canadian Football League efforts

11   to enter the United States (including a Las Vegas team in the mid-1990s) have all fallen flat.  Even

12   the coverage of the CFL by U.S. networks is relegated to a far distant third behind NFL and

13   college football.

14         91.     Thus the NFL has a monopoly in the U.S. market for Host Cities for major league

15   professional football.

16         **E.      Defendants' Conduct Has Injured Competition**

17         92.     In a competitive market, actual and potential Host Cities (often with investing

18   private interests) could build or renovate stadia for the purposes of hosting professional football

19   teams, and they would be able to compete to host an NFL club on a level playing field.  However,

20   the NFL has complete control over professional football and Defendants have agreed to strictly

21   limit the number and location of NFL franchises to maintain that power.  Thus, even if a Host City

22   and/or private investor built a new stadium and had the capital and infrastructure to operate an

23   NFL franchise, they could not do so without NFL permission and the requisite cartel payment to

24   Defendants.

25         93.     As a result of the artificially restricted supply in the market of professional football

26   teams, Defendants have caused excess demand among actual and potential Host Cities for an NFL

27   franchise.   Defendants then capitalize on their complete market power by charging supra-

28   competitive prices to participate in the market.  Those who will not pay are boycotted.

94.    As a result of Defendants' conduct, many actual or potential participants cannot realistically participate in the professional football market even though there is, or would be, considerable interest in their communities in hosting an NFL franchise.  The market has been limited to the small number of Host Cities willing to meet Defendants' supra-competitive demands.

**F.    Defendants' Anticompetitive Conduct Has Injured Plaintiff**

95.    Defendants' consciously joined and participated in the conspiracy by violating the Relocation Policies, supporting and approving the Raiders' relocation to Las Vegas (including but not limited to voting and collecting the relocation fee), and boycotting Plaintiff as a Host City for an NFL Club.  Such collusive conduct has been enormously injurious to Plaintiff and its citizens.

96.    Among other damages, Plaintiff has invested and borrowed significant sums of money, totaling over $240 million, in reliance on the Relocation Policies and the presence of the Raiders in Oakland and at the Coliseum.  Further, Plaintiff will soon lose the significant tax and other income that it derives from the presence of the Raiders and the economic activity their presence generates.  In addition, Plaintiff now owns a stadium that has been boycotted by the NFL and, thus, has incurred the significant diminution in property value caused by that boycott.

97.    All of these losses and injuries are directly related to, and caused by, the anticompetitive conduct of Defendants, including their contract, combination or conspiracy in the restraint of trade and interstate commerce, and their resulting breach of the Relocation Policies.

## VI.    CAUSES OF ACTION

### COUNT I:  Violation of the Sherman Act (15 U.S.C. § 1)

### Group Boycott:  Damages/Disgorgement

98.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

99.    Defendants have violated Section 1 of the Sherman Act (15 U.S.C. § 1), by engaging in a contract, combination or conspiracy in restraint of trade and interstate commerce, the nature and effect of which is to restrict the ability of Plaintiff and other Host Cities to maintain and sponsor an NFL Club at competitive prices.

100. Through their unlawful contract, combination or conspiracy to restrain trade and interstate commerce, Defendants have imposed anticompetitive prices and complete control for hosting an NFL Club by offering Host Cities a Hobson's choice: pay the enormous demands associated with new and renovated stadia or lose your NFL Club. These demands have forced municipalities like Plaintiff – cities and counties that will not pay the supra-competitive price of the NFL's demands for new and renovated stadia – out of the market for NFL franchises, as evidenced by the Raiders' relocation to Las Vegas. Indeed, as a result of Defendants' boycott and refusal to deal, Oakland lost not only the Raiders, but also any chance to host a NFL team in the future. In a competitive marketplace, Defendants could not have successfully demanded these monopolistic rents and the Raiders would be staying in Oakland.

101. Defendants' unlawful contract, combination or conspiracy in restraint of trade and interstate commerce operates as a group boycott.

102. Defendants' group boycott constitutes an unreasonable restraint of trade. First, Defendants have complete control over the NFL Clubs and their Host Cities. Second, the clear objective of Defendants' misconduct is to freeze the number of competitive professional football teams and to increase Defendants' profits, voting in favor of relocations in direct opposition to the Relocation Policy in order to collect exorbitant relocation fees, and monopolistic rents paid by wealthier Host Cities. Third, Defendants' group boycott is not necessary for the production of professional football or the achievement of any pro-competitive NFL objective.

103. Each of the Defendants is a participant in this unlawful contract, combination or conspiracy.

104. As a result of Defendants' violations of the Sherman Act, Plaintiff has suffered injury from the impending loss of the Raiders and the economic activity generated by the Raiders' presence in Oakland. These losses, current and future, are significant and were directly caused by Defendants' unlawful restraint of trade.

105. Further, Defendants' unlawful group boycott has resulted in enormous profits for each of the NFL Clubs, including monetary concessions from Las Vegas and inflated stadium revenue enjoyed by the Raiders, and all other NFL Clubs sharing in the relocation fee assessed on

the Raiders. The policies underlying the Sherman Act, and the federal proscription of anticompetitive behavior (including group boycotts), demands that these illicit profits be disgorged.

106. Accordingly, Plaintiff is entitled to a judgment of damages against the Defendants, jointly and severally, in an amount to be determined at trial. Further, under Section 15 of the Sherman Act, Plaintiff seeks a trebling of their damages.

107. In addition, or alternatively, Plaintiff is entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

## COUNT II: Violation of the Sherman Act (15 U.S.C. § 1)

### Refusal to Deal: Damages/Disgorgement

108. Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

109. There is a relevant market for the hosting of NFL teams in the United States, as alleged above.

110. Within this relevant geographic market, Defendants have violated Section 1 of the Sherman Act (15 U.S.C. § 1), by engaging in a contract, combination or conspiracy in restraint of trade and interstate commerce, the nature and effect of which is to restrict the ability of Plaintiff and other Host Cities to maintain and sponsor an NFL Club at competitive prices.

111. Through their unlawful contract, combination or conspiracy to restrain trade and interstate commerce, Defendants have imposed anticompetitive prices and complete control on the market for hosting an NFL Club by offering Host Cities a Hobson's choice: pay the enormous demands associated with new and renovated stadia or lose your NFL Club. These demands have forced municipalities like Plaintiff – cities and counties that will not pay the supra-competitive price of the NFL's demands for new and renovated stadia – out of the market for NFL franchises, as evidenced by the Raiders' relocation to Las Vegas. Indeed, as a result of Defendants' refusal to deal, Oakland lost not only the Raiders, but also any chance to host a NFL team in the future. In a competitive marketplace, Defendants could not have successfully demanded these monopolistic rents and the Raiders would be staying in Oakland.

112.     Defendants' unlawful contract, combination or conspiracy in restraint of trade and interstate commerce operates as a concerted refusal to deal.

113.     Defendants' refusal to deal constitutes an unreasonable restraint of trade.  First, Defendants have complete market power in the relevant market.  Second, the clear objective of Defendants' misconduct is to freeze the number of competitive professional football teams and to increase Defendants' profits through a concerted refusal to deal, voting in favor of relocations in direct opposition to the Relocation Policy in order to collect exorbitant relocation fees, and monopolistic rents paid by wealthier Host Cities.  Third, Defendants' refusal to deal is not necessary for the production of professional football or the achievement of any pro-competitive NFL objective.

114.     Each of the Defendants is a participant in this unlawful contract, combination or conspiracy.

115.     As a result of Defendants' violations of the Sherman Act, Plaintiff has suffered injury from the impending loss of the Raiders and the economic activity generated by the Raiders' presence in Oakland.  These losses, current and future, are significant and were directly caused by Defendants' unlawful restraint of trade.

116.     Further, Defendants' unlawful refusal to deal has resulted in enormous profits for each of the NFL Clubs, including monetary concessions from Las Vegas and inflated stadium revenue enjoyed by the Raiders, and all other NFL Clubs sharing in the relocation fee assessed on the Raiders.   The policies underlying the Sherman Act, and the federal proscription of anticompetitive behavior (including concerted refusals to deal), demands that these illicit profits be disgorged.

117.     Accordingly, Plaintiff is entitled to a judgment of damages against the Defendants, jointly and severally, in an amount to be determined at trial.  Further, under Section 15 of the Sherman Act, Plaintiff seeks a trebling of their damages.

118.     In addition, or alternatively, Plaintiff is entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

/ / /

## COUNT III:  Violation of the Sherman Act (15 U.S.C. § 1)

## Price Fixing:  Damages/Disgorgement

119.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

120.    There is a relevant market for the hosting of professional football teams in the United States, as alleged above.

121.    Within this geographic market, Defendants have violated Section 1 of the Sherman Act (15 U.S.C. § 1), by engaging in a contract, combination or conspiracy in restraint of trade and interstate commerce, the nature and effect of which is to restrict the ability of Plaintiff and other Host Cities to maintain and sponsor an NFL Club at competitive prices.

122.    Through their unlawful contract, combination or conspiracy to restrain trade and interstate commerce, Defendants have imposed anticompetitive prices and complete control on the market for hosting an NFL Club by offering Host Cities a Hobson's choice:  pay the enormous demands  associated with new and renovated stadia or lose your NFL Club.  These demands have forced municipalities like Plaintiff – cities and counties that will not pay the supra-competitive price of the NFL's demands for new and renovated stadia – out of the market for NFL franchises, as evidenced by the Raiders' relocation to Las Vegas.  In a competitive marketplace, Defendants could not have successfully demanded these monopolistic rents and the Raiders would be staying in Oakland.

123.    Defendants' unlawful contract, combination or conspiracy in restraint of trade and interstate commerce operates as a horizontal price fixing scheme.

124.    Defendants' price fixing scheme constitutes an unreasonable restraint of trade.  First, Defendants have complete market power in the relevant market.  Second, the clear objective of Defendants' misconduct is to control the location and the number of competitive professional football teams and to increase Defendants' profits through the artificially inflated and monopolistic rents charged to, and paid by, wealthier Host Cities.  Third, Defendants' price fixing scheme is not necessary for the production of professional football or the achievement of any pro-competitive NFL objective.

125.     Each of the Defendants is a participant in this unlawful contract, combination or conspiracy.

126.     As a result of Defendants' violations of the Sherman Act, Plaintiff has suffered injury from the impending loss of the Raiders and the economic activity generated by the Raiders' presence in Oakland.  These losses, current and future, are significant and were directly caused by Defendants' unlawful restraint of trade.

127.     Further, Defendants' unlawful price fixing scheme has resulted in enormous profits for each of the NFL Clubs, including monetary concessions from Las Vegas and inflated stadium revenue enjoyed by the Raiders, and all other NFL Clubs sharing in the relocation fee assessed on the Raiders.   The policies underlying the Sherman Act, and the federal proscription of anticompetitive behavior (including horizontal price fixing schemes), demands that these illicit profits be disgorged.

128.     Accordingly, Plaintiff is entitled to a judgment of damages against Defendants, jointly and severally, in an amount to be determined at trial.  Further, under Section 15 of the Sherman Act, Plaintiff seeks a trebling of their damages.

129.     In addition, or alternatively, Plaintiff is entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

## COUNT IV:  Violation of the Sherman Act (15 U.S.C. § 1)

### Declaratory Judgment

130.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

131.     There is a relevant market for the hosting of NFL football teams in the United States.

132.     Within this geographic market, Defendants have violated Section 1 of the Sherman Act (15 U.S.C. § 1), by engaging in a contract, combination or conspiracy in restraint of trade and interstate commerce, the nature and effect of which is to restrict the ability of Plaintiff and other Host Cities to maintain and sponsor an NFL Club at competitive prices.

/ / /

133. Through their unlawful contract, combination or conspiracy to restrain trade and interstate commerce, Defendants have imposed anticompetitive prices and complete control on the market for hosting an NFL club by offering Host Cities a Hobson's choice: pay the enormous demands associated with new and renovated stadia or lose your NFL Club. These demands have forced municipalities like Plaintiff – cities and counties that will not pay the supra-competitive price of the NFL's demands for new and renovated stadia – out of the market for NFL franchises, as evidenced by the Raiders' relocation to Las Vegas. Indeed, as a result of Defendants' boycott and refusal to deal, Oakland lost not only the Raiders, but also any chance to host a NFL team in the future. In a competitive marketplace, Defendants could not have successfully demanded these monopolistic rents and the Raiders would be staying in Oakland.

134. Defendants' unlawful contract, combination or conspiracy in restraint of trade and interstate commerce operates as a horizontal group boycott and concerted refusal to deal. Defendants' conduct also operates as a horizontal price fixing scheme.

135. Defendants' unlawful conduct constitutes an unreasonable restraint of trade. First, Defendants have complete market power in the relevant market. Second, the clear objective of Defendants' misconduct is to freeze the number of competitive football teams and to increase Defendants' profits through a concerted refusal to deal, voting in favor of relocations in direct opposition to the Relocation Policy in order to collect exorbitant relocation fees, and monopolistic rents paid by wealthier Host Cities. Moreover, Defendants' group boycott, refusal to deal and price fixing scheme are not necessary for the production of NFL football or the achievement of any pro-competitive NFL objective.

136. Each of the Defendants is a participant in this unlawful contract, combination or conspiracy.

137. Accordingly, Plaintiff, as a boycotted Host City, is entitled to an Order of this Court declaring that Defendants' (a) boycott of Oakland and refusal to comply with their own Relocation Policies, and (b) redistribution of the resulting ill-gotten supra-competitive gains through artificially set relocation fees to all NFL Clubs as a *quid pro quo* for breaching the terms

of those Policies, amount to an unreasonable restraint on trade and interstate commerce and a violation of the antitrust laws.

### COUNT V:  Breach of Contract (Cal. Civ. Code § 1559)

### Damages

138.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

139.    Pursuant to California Civil Code section 1559, "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."

140.    The NFL Constitution (*see* Exhibit 1) and the Relocation Policies promulgated pursuant to Section 4.3 of the of the NFL Constitution (*see* Exhibit 2) are collectively a binding, enforceable contract among the NFL Clubs.  The Relocation Policies, as a binding contract, were also made expressly for the benefit of Host Cities.

141.    Plaintiff, as the Host City for the Raiders, is an express and intended beneficiary of the NFL Constitution and Relocation Policies.  Defendants, in enacting the Relocation Policies, intended to benefit Host Cities by establishing standards and procedures for relocation decisions. The Policies limit subjective decision-making and are designed to protect the interests and investments of Host Cities like Plaintiff.

142.    Indeed, there can be no doubt that the Relocation Policies were enacted for the benefit of Plaintiff.  The Relocation Policies were promulgated after the Raiders decided to leave Oakland in 1982 for Los Angeles.  The NFL undertook substantial efforts to prevent the Raiders' move and to keep the club in Oakland.  Having failed to do so, the NFL crafted the Relocation Policy to prevent the type of "franchise free agency" which led to the Raiders' decision to leave Oakland in the first place (before their return to Oakland in 1995).  Now, 33 years after their enactment, the NFL has turned its back both on the purpose of the Relocation Policies and Oakland.

143.    Pursuant to the NFL Constitution, and the Policies promulgated thereunder, Defendants assumed direct obligations to Plaintiff, including, but not limited to, the obligation to

"work diligently and in good faith to obtain and to maintain suitable stadium facilities in [each NFL Club's] home territor[y], and to operate in a manner that maximizes fan support in their current home community." As to the Raiders' desire to relocate, Defendants also had an obligation to consider:

- "[t]he extent to which fan loyalty and support for the club has been demonstrated during the team's tenure in the current community;"

- "the willingness of the stadium authority or the community to remedy any deficiencies in or to replace such facility, including whether there are legislative or referenda proposals pending to address these issues; and the characteristics of the stadium in the proposed new community";

- "[t]he extent to which the club, directly or indirectly, received public financial support by means of any publicly financed playing facility, special tax treatment, or any other form of public financial support and the views of the stadium authority (if public) in the current community";

- "[t]he club's financial performance, particularly whether the club has incurred net operating losses (on an accrual basis of accounting), exclusive of depreciation and amortization, sufficient to threaten the continued financial viability of the club, as well as the club's financial prospects in its current community"; and

- "[t]he degree to which the club has engaged in good faith negotiations . . . with appropriate persons concerning terms and conditions under which the club would remain in its current home territory and afforded that community a reasonable amount of time to address pertinent proposals."

All of these factors supported the Raiders' continued presence in Oakland.

144. During the past 25 years, Plaintiff has contributed hundreds of millions of dollars to attract, retain and support the Raiders, all spent in reliance on the Relocation Policies and the obligations of Defendants under those Policies.

145. Despite the financial support and loyalty provided to the Raiders by Plaintiff and the Oakland-based fans, Defendants have breached the terms of the Relocation Policies in approving the Raiders' relocation to Las Vegas.

146. Defendants intentionally interfered with Plaintiff's prospective economic advantage. Defendants' actions were undertaken with a conscious disregard of the rights of Plaintiff. As a direct and proximate result of Defendants' breach of the Relocation Policies, Plaintiff – as an intended beneficiary of those Policies – has been deprived of a professional football franchise and all of its benefits, damaging Plaintiff in an amount to be determined at trial.

## COUNT VI:  Quantum Meruit

### Restitution

147.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

148.    Defendants, in enacting the Relocation Policies, intended to benefit Host Cities by establishing standards and procedures for relocation decisions.  The Policies limit subjective decision-making and are designed to protect the interests and investments of Host Cities like Plaintiff.

149.    Indeed, there can be no doubt that the Relocation Policies were enacted for the benefit of Plaintiff.  The Relocation Policies were promulgated after the Raiders decided to leave Oakland in 1982 for Los Angeles.  The NFL undertook substantial efforts to prevent the Raiders' move and to keep the club in Oakland.  Having failed to do so, the NFL crafted the Relocation Policy to prevent the type of "franchise free agency" which led to the Raiders' decision to leave Oakland in the first place (before their return to Oakland in 1995).  Now, 33 years after their enactment, the NFL has turned its back both on the purpose of the Relocation Policies and Oakland.

150.    Pursuant to the NFL Constitution, and the Policies promulgated thereunder, Defendants assumed direct obligations to Plaintiff, including, but not limited to, the obligation to "work diligently and in good faith to obtain and to maintain suitable stadium facilities in [each NFL Club's] home territor[y], and to operate in a manner that maximizes fan support in their current home community."   As to the Raiders' desire to relocate, Defendants also had an obligation to consider:

- "[t]he extent to which fan loyalty and support for the club has been demonstrated during the team's tenure in the current community;"

- "the willingness of the stadium authority or the community to remedy any deficiencies in or to replace such facility, including whether there are legislative or referenda proposals pending to address these issues; and the characteristics of the stadium in the proposed new community";

- "[t]he extent to which the club, directly or indirectly, received public financial support by means of any publicly financed playing facility, special tax treatment, or

any other form of public financial support and the views of the stadium authority (if public) in the current community";

- "[t]he club's financial performance, particularly whether the club has incurred net operating losses (on an accrual basis of accounting), exclusive of depreciation and amortization, sufficient to threaten the continued financial viability of the club, as well as the club's financial prospects in its current community"; and

- "[t]he degree to which the club has engaged in good faith negotiations . . . with appropriate persons concerning terms and conditions under which the club would remain in its current home territory and afforded that community a reasonable amount of time to address pertinent proposals."

All of these factors supported the Raiders' continued presence in Oakland.

151.    During the past 25 years, Plaintiff has invested hundreds of millions of dollars to attract, retain and support the Raiders, all spent in reliance on the Relocation Policies and the obligations of Defendants under those Policies. Plaintiff made those investments with the express understanding between Plaintiff and the Defendants that: (a) Defendants would comply with the Relocation Policies; (b) Defendants would support Oakland as the Host City for the Raiders, and (c) Plaintiff would recoup its investments in the Raiders through the revenues generated by the Raiders' continued presence in Oakland. The Raiders, the NFL and all NFL Clubs benefited tremendously from Plaintiff's investment in the Raiders.

152.    Neither Plaintiff nor Defendants believed that Plaintiff's investment in the Raiders was gratuitous, or that the Relocation Policies somehow did not apply to Plaintiff or the Raiders.

153.    By virtue of allowing the Raiders to relocate, in blatant violation of the Relocation Policies, Defendants have deprived Plaintiff of the revenues necessary to recoup its investment in the Raiders. Defendants have made no effort to reimburse Plaintiff for the investments it made in the Raiders, or otherwise compensate Plaintiff for the unlawful relocation of the Raiders.

154.    Defendants are estopped from denying the obligatory nature of the Relocation Policies. The NFL adopted the Policies specifically to provide a process and standards to reign in subjective decision-making in the hope of avoiding further antitrust liability. Defendants, through NFL representatives, have admitted that the Policy imposes obligations on the NFL Clubs, and that the Policies must be satisfied for a relocation petition to be approved. Given the history of the Relocation Policies – and the NFL's position regarding the Policies' role in the relocation

process – Plaintiff relied on the Relocation Policies in structuring its relationship with the Raiders. Plaintiff's reliance caused Plaintiff to lose its significant investment in the Raiders, and allowing Defendants to reverse course and reject the Relocation Policies – while enriching themselves – would be unjust.

155. As a direct and proximate result of Defendants' actions, Plaintiff lost, and has been deprived of, its investment in the Raiders.

156. Accordingly, Plaintiff is entitled to restitution in the amount of all sums invested by Plaintiff in the Raiders, in an amount to be determined at trial.

### COUNT VII:  Unjust Enrichment Under California Law

### Damages/Disgorgement

157. Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

158. As a result of their unlawful and inequitable conduct described above, Defendants have and will continue to benefit and be unjustly enriched as a direct result of their collusive actions to the detriment of Plaintiff.

159. Plaintiff is entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct, and are entitled to reimbursement of all ill-gotten gains.

160. The economic benefit Defendants derived is a direct and proximate result of Defendants' unlawful practices.

161. The financial benefits Defendants derived rightfully belong to Plaintiff. Defendants have retained these benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiff.  Defendants were enriched by their illegal activities at the expense of Plaintiff and thus Defendants should be ordered to make restitution for the benefit of Plaintiff because it would be unjust to allow Defendants to retain the benefits.

/ / /

/ / /

/ / /

# VII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff City of Oakland respectfully requests that the Court enter judgment against Defendants and grant the following relief:

1.      On Count One of the Complaint, judgment in favor of Plaintiff and against Defendants, jointly and severally, in an amount to be determined at trial and trebled pursuant to 15 U.S.C. § 15, and/or disgorgement in an amount to be determined at trial;

2.      On Count Two of the Complaint, judgment in favor of Plaintiff and against Defendants, jointly and severally, in an amount to be determined at trial and trebled pursuant to 15 U.S.C. § 15, and/or disgorgement in an amount to be determined at trial;

3.      On Count Three of the Complaint, judgment in favor of Plaintiff and against Defendants, jointly and severally, in an amount to be determined at trial and trebled pursuant to 15 U.S.C. § 15, and/or disgorgement in an amount to be determined at trial;

4.      On Count Four of the Complaint, an Order of the Court declaring that Defendants': (i) boycott of Oakland and refusal to comply with their own Relocation Policies, and (ii) redistribution of the resulting ill-gotten supra-competitive gains through artificially set relocation fees to all NFL Clubs as a quid pro quo for breaching the terms of those Policies, amount to an unreasonable restraint on trade and interstate commerce and a violation of the antitrust laws;

5.      On Count Five of the Complaint, a judgment in favor of Plaintiff and against Defendants, jointly and severally, in amount to be determined at trial;

6.      On Count Six of the Complaint, a judgment in favor of Plaintiff and against Defendants, jointly and severally, in amount to be determined at trial;

7.      On Count Seven of the Complaint, a judgment in favor of Plaintiff and against Defendants, jointly and severally, in amount to be determined at trial;

8.      An award to Plaintiff of its costs, including reasonable attorneys' fees, in prosecuting this action; and

9.      Any other relief to which Plaintiff may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

/ / /

## VIII.  **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a jury trial on all issues so triable.

DATED:  December 11, 2018

By: _____*/s/ Barbara J. Parker*_____
            BARBARA J. PARKER

BARBARA J. PARKER (Bar No. 69722)
  bparker@oaklandcityattorney.org
OTIS McGEE JR. (Bar No. 71885)
  omcgeejr@oaklandcityattorney.org
MARIA BEE (Bar No. 167716)
  mbee@oaklandcityattorney.org
ERIN BERNSTEIN (Bar No. 231539)
  ebernstein@oaklandcityattorney.org
**OAKLAND CITY ATTORNEY**
One Frank Ogawa Plaza, 6th Floor
Oakland, California  94612
Telephone:   (510) 238-3601
Facsimile:    (510) 238-6500

By: _____*/s/ James W. Quinn*_____
            JAMES W. QUINN

JAMES W. QUINN
  jquinn@bafirm.com
DAVID BERG
  dberg@bafirm.com
MICHAEL M. FAY
  mfay@bafirm.com
JENNY H. KIM
  jkim@bafirm.com
CHRISTOPHER L. SPRENGLE
  csprengle@bafirm.com
BRONWYN M. JAMES
  bjames@bafirm.com
**BERG & ANDROPHY**
120 West 45th Street, 38th Floor
New York, New York  10036
Telephone:   (646) 766-0073
Facsimile:    (646) 219-1977

By: _____*/s/ Clifford H. Pearson*_____
            CLIFFORD H. PEARSON

CLIFFORD H. PEARSON (Bar No. 108523)
  cpearson@pswlaw.com
DANIEL L. WARSHAW (Bar No. 185365)
  dwarshaw@pswlaw.com
MICHAEL H. PEARSON (Bar No. 277857)
  mpearson@pswlaw.com
MATTHEW A. PEARSON (Bar No. 291484)
  mapearson@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California  91403
Telephone:   (818) 788-8300
Facsimile:    (818) 788-8104

BRUCE L. SIMON (Bar No. 96241)
  bsimon@pswlaw.com
BENJAMIN E. SHIFTAN (Bar No. 265767)
  bshiftan@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, California  94104
Telephone:   (415) 433-9000
Facsimile:    (415) 433-9008

*Attorneys for Plaintiff City of Oakland*